# THE PREROGATIVE COURT

OF

# THE STATE OF NEW JERSEY,

## OCTOBER TERM, 1887.

ALEXANDER T. MCGILL, ESQ., ORDINARY.

ANNA M. AYRES, appellant,

*v.*

SAMUEL AYRES et al., respondents.

1. The testimony was held to establish that, although the testator was in the last stages of consumption, he possessed testamentary capacity.

2. It was also held that the evidence did not sustain the insistment that fraud was practised upon the testator.

3. The attesting clause did not state that the witnesses subscribed their names in the presence of the testator, but the proofs established that they signed on a bureau, at the foot of the bed on which the testator lay, so supported that he could see the motion of the pen on the paper, although he could not distinguish the letters the pen was forming, and that the testator's eyes were open during the signing, and that at its conclusion he instructed his uncle, who was named as an executor in the will, to take the custody of the

565

paper. It was held that such signing was sufficient compliance with the requirement of the statute that the witnesses shall sign in the presence of the testator.

4. Where, after the testator has signed the will in the presence of the witnesses, one of them, in the presence of the other, asked if the paper was all right, and the testator replied, " That is all right, John, that is my will," it was held that the instrument was sufficiently declared to be the testator's last will.

On appeal from Middlesex county orphans court.

*Mr. Garret Berry,* for appellant.

*Mr. Alan H. Strong,* for respondents.

THE ORDINARY.

Ellis M. Ayres executed the paper which is the subject of this contest, on Sunday, the 19th day of June, 1887, at about three o'clock in the afternoon, and died the next day about eleven o'clock at night. His estate consisted of the undivided half of a small farm of about thirty-two acres, situated near Rahway, and some household furniture and farming implements. The farm was owned by him and his brother Samuel. The testator resided in the dwelling-house upon the farm with his mother and wife, and his two children, both of whom were under two years of age at his death. The brother Samuel assisted in working the farm, but did not reside upon it.

The will was drawn by two cousins of the decedent, Joseph Ayres, a physician of Newark, and his sister, Sarah M. Noe (who, with their father, had come to pass the day at the farm), at the suggestion of the brother Samuel, in a conversation with Joseph Ayres, in the barn, just prior to the making of the instrument.

The entire conversation is not given, but from the fragments which are disclosed by the evidence, I gather the fact that Samuel suggested the propriety of a will. It is insisted, for the appellant, that the brother designed to procure such a paper in order that he might be relieved of the burden of the maintenance of his mother, and at the same time retain possession and control of the

entire farm, and prevent any portion of it going into the posses-
sion of the appellant's father, who occupies adjoining land.
This insistment is based solely upon proof of the fact that
Samuel suggested the propriety of a will, coupled with the sub-
sequent production of an instrument so framed that provision is
made for the support of the mother, and that the brother may pos-
sibly, for a time at least, retain possession and control of the farm.
That instrument provides that the executors may sell the real
and personal estate; that one-third of the income of the estate
shall go for the support of the testator's mother for life, and that
the remainder shall go to the support and education of his two
children; that if either child shall die before he or she shall
reach the age of eighteen years, his or her interest in the estate
shall go to the surviving child, and if both shall die before
that age, the income of the estate shall go the wife for life, and
the principal to the testator's next of kin. It appoints the wife
guardian of the children, and the brother Samuel, and an uncle,
Ezra Ayres, executors of the will.

The decedent's wife, Anna M. Ayres, was the caveatrix below,
and is the appellant here. She contests the admission of the
paper to probate as her husband's will, alleging, as grounds for
so doing, first, that the decedent's cousins, intending to perpetrate
a fraud, made the will for him and caused him to sign it, al-
though at the time he did not understand its provisions or pos-
sess sufficient mental capacity to understand them; and second,
that the paper was not executed with the formalities required by
the statute.

There can be no doubt that the testator was very ill at the time
the will was executed. He was in the last stages of consump-
tion; his lungs were in such a condition that he was compelled
to continually struggle for breath. His strength was certainly
leaving him, despite the stimulants with which he was sustained.
He was feverish, but, I think, not affected to delirium. His
physician, who visited him seven times, gives it as his opinion
that his patient was at times delirious, grounding his opinion
upon the patient's insistment that he "was better," or "had slept
well," when the contrary appeared to be the truth. I cannot

agree that this is a safe criterion by which delirium may be determined, but it is well known that many of those who suffer with consumption, though in full possession of their faculties, will hope and deceive themselves to the very end of life. The testator's remark to Mrs. Noe, when she left him to return to her home, and said that she did not expect to see him again "this side of the river," that he did not know, that perhaps he would rally, indicates that he was not an exception to this class. The physician seemed to be daily expecting his patient's death, and it may be possible that the patient's assurances sprang from a desire to encourage his despondent doctor by sanguine, though perhaps not truthful, accounts of his condition.

Both Mrs. Noe and Ezra Ayres speak of conversations had with the testator on the day, and about the time the will was executed, at which he gave no indication of being, in the least, delirious.

Joseph Ayres, who took a principal part of the preparation of the will, is a physician. He swears most positively that the testator was rational, and that he understood the instrument as it was made. He says that he first took the testator's spontaneous instructions for the will, and then put them in proper form, and read them to him, and, upon his approval of them, had the will prepared therefrom, and read that to him, and that the testator then expressed himself as fully satisfied with the document.

The caveatrix does not swear that her husband was delirious, but testifies that he was in so nervous a condition that he directed her to go out of the room, with the remark, "This excitement will kill me." She thinks that his excitement then, was attributable to the constant moving of persons about the room of the sick man.

I think that the weight of evidence clearly establishes that the testator had capacity to understand, and did fully comprehend and intend the provisions of the will.

I fail to find anything in the case to justify even a reasonable suspicion that any fraud was practised upon him.

The second ground of contest is based upon the insistment that the formalities required by the statute were not complied with.

Ayres *v.* Ayres.

The statute requires that a will (1) shall be in writing ;. (2) shall be signed by the testator ; (3) his signature shall be made by the testator, or the making thereof acknowledged by him ; (4) and such writing declared to be his last will in the presence of two witnesses present at the same time, who shall subscribe their names thereto as witnesses in the presence of the testator. The last clause, relating to the presence of witnesses and the presence of the testator, requires that all shall be together when the signature is made, or the making thereof acknowledged, and when the declaration that it is his will is made. . *Rev. p. 1247* § *22 ; Ludlow* v. *Ludlow, 9 Stew. Eq. 597.*

Where the attestation clause of a will contains a statement of the performance of all the statutory requisites to the due execution of the will, it is in the highest degree useful.

In *Allaire* v. *Allaire, 8 Vr. 312, 325,* Mr. Justice Depue says : "It is *prima facie* evidence of all the facts stated in it. If, by the death of the attesting witnesses, or their absence beyond the reach of process, or for any other cause, a foundation be laid for the introduction of secondary evidence, proof of their signatures will be evidence that what they attested in fact did take place. And if the attesting witnesses, when called, admit their signatures, but, through their defect of memory, or for any other reason, fail to testify to the due execution of the will, it may be established on the presumption arising from the form of the attesting clause, unless there be affirmative evidence given to disprove its statements." *Mundy* v. *Mundy, 2 McCart. 290 ; Tappen* v. *Davidson, 12 C. E. Gr. 459 ; Ludlow* v. *Ludlow, 9 Stew. Eq. 597 ; McCurdy* v. *Neall, 15 Stew. Eq. 333.*

The attestation clause in the will before me is in the following words :

"Signed, sealed, published and declared by the said Ellis M. Ayres to be his last will and testament, in the presence of us, who were present at the same time, and in the presence of each other."

It will be observed that this clause does not certify the fact that the witnesses subscribed their names as witnesses in the

presence of the testator. It is insisted that the proofs do not
establish the performance of this requisite of the statute.

"The object of the statute, that the witness shall sign in the
presence of the testator," says Chancellor Runyon, in *Mandeville*
v. *Parker*, *4 Stew. Eq. 242*, "is to prevent substitution and fraud
upon him."

At the time of the execution of the will the testator lay upon
an old-fashioned bedstead with a high foot-board, beyond which
stood a bureau. When he signed the will he sat up in the bed,
in part supported by pillows, and in part supported by one of the
testamentary witnesses. After he had signed he lay back upon
the pillows, and the will was taken to the bureau, at the foot of
the bed, and there signed by the two witnesses. The witnesses
saw the testator and each other sign, but it is questioned whether
the testator saw them sign.

In *Mandeville* v. *Parker*, above cited, Chancellor Runyon
says: "An attestation made in the same room in which he (testa-
tor) is, is *prima facie* an attestation in his presence. On the
other hand, an attestation made in another room is *prima facie*
not made in his presence."

The proof that the witnesses signed at the bureau, in the room
in which the testator was, establishes a *prima facie* compliance
with the statute, and, unless it shall affirmatively appear that the
testator did not see the witnesses sign, it must be held that he did
see them do so.

The testimony, instead of rebutting, supports the *prima facie*
case. Peter B. Emmons, one of the attesting witnesses, says:

"After Mr. Ayres signed the paper he gave it to his cousin, Joe Ayres; he
walked around to the foot of the bed, and there fixed a place for us to sign it;
* * * I think the testator could see us sign the will, if the foot of the bed
was not higher than the bureau, and I don't think it was."

John J. Freeman, the other witness to the will, says:

"Mr. Joe took the will, and went to the foot of the bed, to a bureau; * * *
I signed the will at the bureau, and also Mr. Emmons signed it at the same
place; I think that Mr. Ayres, the testator, could see Mr. Emmons sign from

where he was lying; I have no doubt that he could; when he signed we stood with our sides towards him, in such a position that I think he could see the paper."

This witness also testifies that he looked at the testator after he lay back on the pillow, and that his eyes were open; also, that he noticed that the foot-board of the bed was not as high as the bureau.

Joseph Ayres says that he watched the witnesses sign; that the testator was propped up with pillows, and that there was nothing to prevent him from also seeing them sign the paper.

Sarah M. Noe says that when the witnesses were signing she stood by the sick man with a fan; that after he had signed he rested back on the pillows nearly upright; that he looked at the witnesses; that she thinks he could see them sign; that her head was about on the same level with the testator's head, and that she could see the motion of the pen on the paper, but could not distinguish the letters the pen was forming.

I think that these proofs make it affirmatively appear that, within the law, the signing of the witnesses was in the presence of the testator. There was evidently no opportunity for substitution or fraud. The witnesses Freeman and Emmons both swear that, after they had signed the will as witnesses, the testator said (referring to the will): "Uncle Ezra, you take it." This remark indicates that he was in full possession of his faculties, and had his mind occupied with that which was being done. It is to be remembered that Ezra Ayres was one of the executors of the will.

It is further objected that the testator did not declare the will to the witnesses, and ask them to witness its execution. The statute now in force does not require the testator to ask the witnesses to witness the execution of the will, but I will consider this objection as if such were the requirement of the law.

Joseph Ayres says that, after he had read the will to his cousin, the testator, he asked him who should be called as witnesses, and that the testator named John Freeman as one, and, upon Mrs. Noe's remarking that Mr. Emmons was in the house, the testator said that Freeman and Emmons would do, to go and bring them.

Mrs. Noe says that she went out and said to Freeman and Emmons that the testator wished them to sign the will as witnesses. Emmons says that when the testator signed, Freeman asked him, the testator, if the paper was all right, and he replied : " That is all right, John ; that is my will." Freeman says that he asked the testator if he was satisfied with, " that will," and that the testator replied yes, that it was all right.

I think that this proof establishes a sufficient declaration of the will and request to the witnesses.

It was held, in *Whitenack* v. *Stryker, 1 Gr. Ch. 8* (in 1838), that the witnesses must attest the will at the request of the testator, but that it is unnecessary that the testator shall, in express language, make the request; that his acquiescence, when the witnesses are called for that purpose by another, is sufficient.

In *Mundy* v. *Mundy, 2 McCart. 290*, it was held that there must be some declaration by the testator that it is his will, and communication by him to the witnesses that he desires them to attest it as such ; but that this need not be by word ; that any act or sign by which the communication can be made is enough. Chancellor Williamson, in this case, says : " The scrivener, in the presence of the testator, says, ' This is the will of A B, and he desires you to witness it '—the testator standing by—is a sufficient publication or declaration. The form is immaterial. But the witnesses must know it is the will of the testator they are witnessing, and they must witness at his request." *Turnure* v. *Turnure, 8 Stew. Eq. 437.*

The testator's request to Mrs. Noe to call Messrs. Freeman and Emmons as witnesses to the will, the declaration to Freeman, the signing by the testator and the witnesses, and the instruction to one of the executors, named in the paper, to take possession of it, so combine words and acts as to constitute satisfactory proof that the testator intended that Freeman and Emmons should understand that the document was his will, and that they were to witness its execution, and, as well, that those gentlemen so understood, as the testator intended they should. I think that this is a substantial and sufficient compliance with the statute.

I will affirm the decree of the orphans court.